FILED

Jul 28 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 25-00217-EJD (SVK) |
| Plaintiff, | VIOLATIONS:<br>18 U.S.C. § 371 – Conspiracy to Commit Export |
| v. | Control Violations;<br>50 U.S.C. § 4819(d), 18 U.S.C. § 981(a)(1)(C), 21 |
| CADENCE DESIGN SYSTEMS, INC., | U.S.C. § 853, and 28 U.S.C. § 2461(c) – Forfeiture |
| Defendant. | SAN JOSE VENUE |

I N F O R M A T I O N

The United States Attorney charges:

Introductory Allegations

At all times relevant to this Information, except where otherwise stated:

1.      Defendant Cadence Design Systems, Inc ("Cadence") was a multinational electronic design automation ("EDA") technology company headquartered in San Jose, California with subsidiary and affiliate entities around the world.  It offered EDA hardware and software, semiconductor design intellectual property ("IP") technology, and related services.  Cadence's EDA tools supported the development of electronic chips and semiconductor devices used in a wide range of applications, including consumer devices, communications, cloud and data center equipment, personal computers, supercomputers, automotive systems, medical systems, and other devices.

2.      Cadence Design Systems Management (Shanghai) Co., Ltd. ("Cadence China") was a subsidiary of Cadence located in the People's Republic of China ("PRC") through which Cadence sold products and services to customers in the PRC.  Cadence China was indirectly owned and wholly

INFORMATION                                1

controlled by Cadence through Cadence Design Systems (Ireland) Limited, a wholly owned and controlled subsidiary of Cadence that was the sole shareholder of Cadence China.

3.     National University of Defense Technology (国防科技大学) or "NUDT" (国防科大) was a university in the PRC under the leadership of the PRC's Central Military Commission.  NUDT was added to the U.S. Department of Commerce's Entity List on February 18, 2015, due to its use of "U.S.-origin multicores, boards, and (co)processors to produce the TianHe-1A and TianHe-2 supercomputers."  *See* 80 Fed. Reg. 8,524 (Feb. 18, 2015).  These supercomputers were "believed to support nuclear explosive simulation and military simulation activities."  *See* 84 Fed. Reg. 29371 (June 24, 2019) (identifying "47 Deya Road" and "109 Deya Road" in "Kaifu District, Changsha City, Hunan Province, China" as NUDT's addresses, among others).  NUDT's primary campus was in Changsha, in Hunan Province, PRC.

4.     Central South CAD Center ("CSCC") was identified as a Cadence China customer from as early as 2002.  Cadence's customer database identified CSCC at 54 Beiya Road, Changsha, PRC— which closely resembled an address on NUDT's campus: 54 Deya Road, Changsha, PRC.  Cadence sold its products and services to CSCC through Cadence China until on or about September 10, 2020.

5.     On or about November 2, 2021, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") sent an "Is Informed" letter to Cadence, pursuant to 15 C.F.R. § 744.21(b), stating that BIS had determined that CSCC posed an unacceptable risk of acting as an agent, front, or shell company for NUDT or of otherwise assisting NUDT in circumventing the license requirements on NUDT.  BIS added CSCC to the Entity List as an alias for NUDT effective June 28, 2022.  *See* 87 Fed. Reg. 38,920 (June 30, 2022).

6.     Phytium Technology Co. Ltd., also known as Tianjin Phytium Information Technology and as Tianjin Feiteng Information Technology (hereinafter "Phytium"), was a fabless semiconductor company in the PRC that specialized in the design of electronic chips and semiconductor devices. Phytium was a legal entity in the PRC and distinct from NUDT.  In 2020, after conducting due diligence and confirming that Phytium was a legal corporate entity, distinct and separate from NUDT, Cadence consented to CSCC's assignment to Phytium of CSCC's contracts for Cadence hardware, software, and IP.  According to public reporting available in 2020, Phytium supplied processors for the TianHe series

of supercomputers associated with the PRC military.  Cadence stopped doing business with Phytium before it was added to the Entity List in 2021 (effective April 8, 2021), as a result of Phytium's involvement in "activities that support China's military actors, its destabilizing military modernization efforts, and/or its weapons of mass destruction (WMD) programs."  86 Fed. Reg. 18,437 (Apr. 9, 2021).

7.    Employee-1 resided in the PRC and was employed by Cadence China.  Employee-1 was a sales account executive responsible for the CSCC and Phytium accounts for Cadence.  Cadence terminated Employee-1 in September 2024.

8.    Employee-2 resided in the PRC and was employed by Cadence China.  Employee-2 was a regional sales director.  Employee-1 reported to Employee-2, and Employee-2 oversaw Employee-1's work on the CSCC and Phytium accounts during some of the relevant period.  Employee-2 separated from Cadence in or about September 2021.

9.    Employee-3 resided in the PRC and was employed by Cadence China.  Employee-3 was a sales group director for Cadence China overseeing customer sales in the PRC.  Employee-1 and Employee-2 reported, directly or indirectly, to Employee-3 during some of the relevant period.  Cadence terminated Employee-3 in or about February 2021.

10.    Employee-4 resided in Asia and was employed by a Cadence subsidiary based in Singapore.  Employee-4 was a corporate vice president of sales overseeing the Asia Pacific market including the PRC.  Employee-1, Employee-2, and Employee-3 reported, directly or indirectly, to Employee-4.  Employee-4 reported to Cadence's then Chief Revenue Officer during some of the relevant time period.

<u>Relevant Legal Background</u>

11.    Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, the President of the United States is granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States.  50 U.S.C. § 1701(a).  Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

12.    On August 17, 2001, the President issued Executive Order 13222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign

policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, BIS promulgated the EAR, which contained restrictions on exports, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730. 2. In Executive Order 13222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents issued annual Executive Notices extending the national emergency declared in Executive Order 13222 through at least August 13, 2018.

13. On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, titled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801-4852. Accordingly, after August 13, 2018, export control laws and regulations are set forth in ECRA and the EAR. In part, ECRA provides permanent statutory authority for the EAR and eliminates the need for the President to declare annually national emergencies pursuant to IEEPA and Executive Order 13222.

14. For conduct that predates August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute. It is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA or ECRA. 50 U.S.C. §§ 1705, 4819.

15. Pursuant to ECRA—and before August 13, 2018, pursuant to IEEPA—BIS reviews and controls the export of certain goods, software, and technologies from the United States to foreign countries through the EAR. In particular, the EAR restrict the export, reexport, or in-country transfer of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR lawfully to be exported from the United States, reexported from one foreign destination to another, and transferred in-country from one end use or end user to another within the same foreign country.

16.     The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at Supplement 1 to Part 774 of the EAR.  Items on the CCL are categorized by an Export Control Classification Number ("ECCN") based on their technical characteristics.  Each ECCN has export control requirements depending on the destination, end user, and end use.

17.     Further, the Entity List, which is set forth in Supplement 4 to Part 744 of the EAR, identifies entities that are subject to additional export, reexport, and in-country transfer restrictions because there is reasonable cause to believe, based on specific and articulable facts, that the entity has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States.  15 C.F.R. § 744.11(c)(3).  The EAR require a prior license from BIS to export, reexport, or transfer in-country items subject to the EAR to entities on the Entity List.

18.     The EAR prohibit, *inter alia*, engaging in any transaction or taking any other action prohibited by or contrary to the EAR, including the export, reexport, or in-country transfer of items subject to the EAR to an entity on the Entity List without a license from BIS.  15 C.F.R. § 764.2(a); *see also* 50 U.S.C. § 4819(a)(2)(A).  The EAR further prohibit ordering, buying, removing, concealing, storing, using, selling, loaning, disposing of, transferring, transporting, financing, forwarding, or otherwise servicing, in whole or in part, or conducting negotiations to facilitate such activities with respect to, any item that has been, is being, or is about to be exported, reexported, or transferred in-country, or that is otherwise subject to the EAR, with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item.  15 C.F.R. § 764.2(e); *see also* 50 U.S.C. § 4819(a)(2)(E).  The EAR also prohibit engaging in any transaction or taking any other action with intent to evade the provisions of the EAR.  15 C.F.R. § 764.2(h); *see also* 50 U.S.C. § 4819(a)(2)(G).

<u>The Scheme to Commit Export Control Violations</u>

19.     From in or about February 2015 through in or about April 2021 (the "relevant time period"), certain Cadence China employees, Cadence China through its employees, and Cadence through its subsidiary Cadence China acting on behalf of Cadence, engaged in a conspiracy to commit export violations in connection with the provision of EDA tools that were subject to the EAR to NUDT

through CSCC, an alias for NUDT, and Phytium, without seeking or obtaining the requisite licenses from BIS.

<u>Manner and Means</u>

20.     During the relevant time period, Cadence through its subsidiary Cadence China, Cadence China, and certain of their employees exported, reexported, and transferred in-country EDA tools subject to the EAR to CSCC, despite having knowledge that CSCC was an alias for NUDT. Specifically, certain Cadence China employees installed EDA hardware on NUDT's Changsha campus, and certain NUDT personnel downloaded EDA software and IP technology from Cadence's download portals.  Certain now-former employees of Cadence China did not disclose to and/or concealed from other Cadence personnel, including Cadence's export compliance personnel, that exports to CSCC were in fact intended for delivery to NUDT and/or the PRC military.  Certain employees of Cadence's subsidiaries, including employees of Cadence China involved in sales to CSCC, also received sales commissions that incentivized achieving certain sales quotas as part of their compensation packages.

21.     As a result, Cadence and Cadence China exported and caused to be exported at least 56 unlawful exports of EDA tools from in or about February 2015 until in or about September 2020, when Cadence terminated Cadence China's business relationship with CSCC due to CSCC's association with NUDT.

22.     Further, in or about October 2020, Cadence and Cadence China had knowledge that items previously sold and exported to CSCC had in fact been exported to NUDT in violation of the EAR. Nevertheless, Cadence consented to CSCC's assignment to Phytium of CSCC's contracts for Cadence EDA tools.  Between in or about November 2020 through in or about February 2021, Cadence, having knowledge that a violation of the EAR had occurred, transferred EDA software and IP technology subject to the EAR.  On March 31, 2021, Cadence placed Phytium on export hold as a result of its internal compliance review and discontinued transactions with Phytium without completing all the originally anticipated transfers, including any hardware transfers.  Phytium was later designated on the Entity List on April 8, 2021.

1

Overt Acts

2     23.    Cadence and Cadence China exported and caused the export of U.S.-origin EDA

3  hardware, software, and semiconductor design IP technology to NUDT without a license or other

4  authorization from BIS during the relevant time period.  These exports or reexports included the

5  following transactions between 2015 and 2020:

6          a)    Ten (10) sales and exports of EDA hardware, including items classified under

7     ECCN 3B991b.2.c;

8          b)    Seventeen (17) sales and exports or reexports of EDA software, including items

9     classified under ECCN 3D991 or designated EAR99;

10         c)    Seven (7) sales and exports or reexports of semiconductor design technology,

11    specifically IP, including items classified under ECCN 3E991; and

12         d)    Twenty-Two (22) loans and exports of EDA hardware, including items classified

13    under ECCN 3B991b.2.c and items designated EAR99.

14    24.    The value of the items delivered to CSCC totaled approximately $45,305,317.41.  This

15  amount included: (i) the revenue that Cadence recognized (on a consolidated basis) for EDA and

16  semiconductor design tools delivered to CSCC in the relevant time period; (ii) the market value of EDA

17  and semiconductor design tools that Cadence delivered to CSCC in the relevant time period for which

18  Cadence did not recognize revenue; and (iii) the market value of the Cadence loaner hardware delivered

19  to CSCC.

20    25.    During the relevant time period, the aforementioned EDA and semiconductor design

21  tools were controlled for export to NUDT pursuant to the EAR.  Cadence and Cadence China did not

22  obtain the requisite license or other authorization from BIS before the export, reexport, or in-country

23  transfer of those items to NUDT or Phytium.

24

25  COUNT 1:    (18 U.S.C. § 371 – Conspiracy to Commit Export Control Violations)

26    26.    Paragraphs 1 through 25 of this Information are re-alleged and incorporated herein.

27

28

INFORMATION                    7

27.     Beginning no later than in or about February 2015 and continuing through in or about April 2021, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendant,

**CADENCE DESIGN SYSTEMS, INC.,**

did unlawfully and knowingly conspire with Cadence China, and with others known and unknown, to willfully export, reexport, and transfer in-country, and cause the export, reexport, and transfer in-country, of items that were controlled for export under the EAR, that is, U.S. semiconductor Electronic Design Automation ("EDA") hardware, software, and technology, without the requisite license or other authorization from the U.S. Department of Commerce, in violation of 50 U.S.C. § 4819, 50 U.S.C. § 1705, and 15 C.F.R. § 764.2.

FORFEITURE ALLEGATION:     (50 U.S.C. § 4819(d), 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c))

28.     The allegations contained in this Information are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 50, United States Code, Section 4819(d), Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c).

29.     Upon conviction for the offense set forth in this Information, the defendant,

**CADENCE DESIGN SYSTEMS, INC.,**

shall forfeit to the United States, pursuant to Title 50, United States Code, Section 4819(d), any property (a) used or intended to be used, in any manner, to commit or facilitate the offense, (b) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the offense; or (c) constituting an item or technology that is exported or intended to be exported in in violation of Title 50, Chapter 58, Subchapter I; and/or shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, involved in such violations, or any property traceable to such property, including, but not limited to, a forfeiture money judgment.

INFORMATION                    8

30. If any of the property described above, as a result of any act or omission of the defendant:

    a) cannot be located upon exercise of due diligence;

    b) has been transferred or sold to, or deposited with, a third party;

    c) has been placed beyond the jurisdiction of the court;

    d) has been substantially diminished in value; or

    e) has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

31. All pursuant to Title 50, United States Code, Section 4819(d), Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED: _7/28/2025_

CRAIG H. MISSAKIAN
United States Attorney

ERIC CHENG
Assistant United States Attorney

SCOTT E. BRADFORD
Acting Chief
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

DATED: July 28, 2025

IAN C. RICHARDSON, Chief Counsel
CHRISTIAN J. NAUVEL, Deputy Chief Counsel
EMMA DINAN ELLENRIEDER, Trial Attorney

INFORMATION                                   9